Good afternoon, Your Honors. May it please the Court. Sai Vandana Peterson for Appellant Andrew Brown. I'd like to reserve seven minutes for rebuttal. All right. Please keep your eye on the clock. I'll try to help you out. Thank you, Your Honor. The eight briefed claims show a trial that was rife with injustice, but I'd like to focus first today on Defense Counsel's ineffectiveness at penalty and second, on the prosecutor's— Can you speak up a little bit, Counsel? Yes, Your Honor. I'd like to focus first on Defense Counsel's ineffectiveness at penalty and second, on the prosecution's bats in violation. Starting with IAC, as the Supreme Court held in Buck v. Davis, when a defendant's own lawyer puts in offending evidence that no competent defense attorney would say about his own client, it's in the nature of an admission against interest, more likely to be taken at face value. Andrew Brown's defense made gratuitous concessions and glaring omissions, thereby undermining his own mitigation on at least four critical issues. First, Counsel's own expert volunteered that in her psychological opinion, Brown was a member of a Compton Bloods gang simply because he was bothered by the Crips when walking through their territory, and Counsel didn't present evidence that Brown was not, in fact, a gang member. Second, Counsel conceded that Brown was a volitional drug user through a single episode when he went to the emergency room at age 17 or 18. He didn't explain, however, that Brown's substance use began when he was just 7 or 8, a little boy living with his grandparents, who supplied him with the hard liquor that turned him into a, and I quote, heavy drinker, unquote, by age 9, that he used marijuana and PCP by age 13 and cocaine by age 16, and that single psychotic episode that was presented was only one in a series. Your Honors, it's hard to fathom a 9-year-old's heavy drinking and impossible to consider it being volitional. Instead, when we hear evidence like that, we consider things like trauma, family background, and we wonder about the grown-ups in that child's life. Third, Counsel conceded that Andrew had a normal, loving life once he moved in with his grandparents, instead of presenting evidence that his grandfather had repeatedly raped his mother when she was a child living under his roof, all while his grandmother condoned it by saying, quote, better him than another man, unquote. Let me ask you this, Counsel, because now we are on a differential review, and as you know, the presumption of reasonableness is quite strong. This isn't the type of case where Counsel didn't present pretty substantial mitigating evidence. And so the fact that Counsel, you know, with every evidence that you present, there could be a counter and could open the door to rebuttal and response evidence by the government. So why aren't these strategic choices to really, instead of focusing on the fact that he used drugs when he was really young, which then could open the door to the fact that he was selling drugs to support his habit, Counsel presented a little bit of that, but really kind of tied it to his heavy drug use was really the pain of childhood trauma. So some of the evidence that you were talking about was admitted. The flavor, and it seems to me the strategy, appears to be different than what you would like Counsel to have done. So that's where the presumption and deferential review parts come in. I understand Your Honor's concern and that ADPA is a deferential standard, but it's not simply what I would have liked Counsel to have done. It is what the Supreme Court has held in cases like Williams and Wiggins and Porter and Rompilla that dictate what Counsel ought to have done. Supreme Court president and this court's own president makes clear that when the defense puts on evidence that is unmistakably aggravating in nature, like gang membership, and we know that this couldn't have been strategic because Counsel fought tooth and nail pre-trial during Vardir to keep out any evidence of gang membership. They argued unsuccessfully in motions in Lemonade to keep out any evidence of gang membership because they knew how damning that would be, and yet this is the defense's own expert who volunteers, unsolicited, that Andrew was a gang member. So I think those are objectively unreasonable decisions with no strategic benefit by Counsel's own on-the-record admissions during trial. Well, at some level, I mean, this is a tough case to defend. It's hard to escape that, the facts. I've had a fair number of these cases. These facts sort of stand out at how troubling the events are and were, and so you've got a tough hand. At some point, why isn't it a reasonable defense strategy to try to connect with the jury as, look, I'm being candid with you. We've got these bad marks. Here they are, and still try to portray a broader picture. You can tell, you can say, well, they tried to keep gang membership out, not getting very far with that, so why not try to, say, get ahead of the curve and say, you can trust me. I'm telling you straight, so you'll believe me later when I tell you that his personal history, family background, and so forth, you need to give a lot of weight to that. Why isn't that a reasonable strategic decision? And more the point for us, how could a fair-minded jurist say the California court's assessment was unreasonable? Your Honor, I think this court can say the California Supreme Court's decision was unreasonable because defense counsel put on the aggravating side of the scale evidence that ought to have been on the mitigating side of the scale, and so we're not just looking at evidence that he failed to present, but rather evidence that he brought forward and caused the jurors to look at his client in an aggravating, in a way that they would fear him. In fact, we have on-the-record statements in trial itself that the jurors feared Andrew because they thought he was a gang membership. They thought that they were followed by members of his gang. All of this is unfounded unless you look at, for example, this example I mentioned, that trial counsel's own defense volunteered that their client was a gang member, and I'll provide another example as well, and that's that the counsel's expert introduced objectively aggravating evidence in the form of the word sociopath, which the Supreme Court and this court have recognized can only be aggravating. That's not a mitigating term when it's usually prosecutors who present words like sociopath and antisocial personality disorder, but here it was the defense's expert, Dr. Kaser Boyd, who introduced that aggravating term, and the prosecutor then emphasized that term to the jury. That term was never explained, and the district court, which this court is reviewing, saw nothing wrong with that and instead said it was fine for the jury to use there, and I quote, common sense, unquote, understanding of what sociopath meant because Brown, quote, clearly fell into the dictionary definition of the term, unquote, and cited dictionary.com. Counsel, can I, on that point, and this was going to be part of my broader question, Dr. Kaser Boyd also spoke at length about the trauma that Andrew experienced, the broken home being removed from his mother, the whippings, all of that terrible aspects of the record, and I understood the sociopath to be that there were symptoms that result from the trauma that could lead to that, but she wasn't suggesting or I thought the record was that she did not think that that was an appropriate identifier for him. Wasn't that the case? She did not make a diagnosis of sociopathic disorder or antisocial personality disorder. You're right, and she did opine about trauma, but, Your Honor, again, it doesn't take a PhD to say that cigarette burns are torture and that they are not normal forms of discipline and that a five-year-old or a four-year-old locked in a dark closet would be terrified of the dark. That was what she was engaged to say. She was a trauma expert. I guess my broader question, though, is you've isolated a few places where maybe some aggravating slivers of things were presented by defense, from the defense side, but as the district court pointed out, there was quite a bit of other evidence and mitigation about the trauma that he went through and intellectual deficits and poor work at school and not getting the sort of treatment and support that he needed. So the district court thought a lot of this would have been cumulative of other stuff. Why is that wrong in your view? Your Honor, I don't think that some trauma is cumulative of more trauma. I think, as I can imagine, a traumatized individual would not agree with that assessment of cumulative trauma. But I'll also say that counsel failed to present much more sympathetic evidence when it made these aggravating concessions about sociopathy. For example, the Supreme Court and this court have held consistently that a different diagnosis of organic brain dysfunction or organic brain damage is mitigating. That was a diagnosis that counsel had, and they glossed over it. Dr. Kaser-Boyd also glossed over it and instead introduced this term sociopathy. And, Your Honor, I appreciate that you will look at Dr. Kaser-Boyd's testimony and parse it out and look at the fact that it wasn't a diagnosis, it was just a term. But that's not what the jury did here, and that's not even what the fact finder, the trial judge here, said. The trial judge summed up the penalty phase presentation as follows. They said, and I quote, although the defendant did undergo prior to the time that he was five or six some deprivation of love and attention, he was taken out of that environment, put into a different environment, which was a very different loving environment. And this is at volume 44 of the transcripts at page 6,437. So I think that the effect on the fact finder in this trial and the jury was very different. Your Honor, you're right that the defense did present some evidence of mitigation of trauma, as did the counsel in Beemore, Beemore versus Chappelle. In fact, I believe there were 40 different witnesses presented at the penalty phase in that case, and this court still found unconstitutionally deficient performance that was prejudicial. And what happened here was similar in that even though witnesses were presented, they were all presented to talk about this isolated episode of trauma. And the district court erroneously found that any more evidence of trauma, of drug use, of mental illness would all be cumulative. And I think that's just that's erroneous. Can I ask you this? One of the things that gave me pause about this case is, and I don't think that this is necessarily so cumulative, but the crime spree that he went through right around the time of the murder, those are very serious, very aggravated, other uncharged crimes. And some of the state habeas evidence was that he was in a state of decompensating basically in the last year, at least before the crime. And I wonder if you could speak to whether there might have been something problematic with not introducing evidence of his mental state decompensation in that period, in order to blunt at least at the penalty phase the notion that he was just unthinking, didn't care, was willing to commit harm against many other people. Yes, Your Honor. I agree with you that there was evidence that he was decompensating severely and rapidly, I believe is the terminology that Dr. Pablo Stewart uses in his declaration to describe what Andrew was going through. And as you pointed out, in a very limited time period, this all happened in the year, I think, 1988, within a couple months. And it is indicative or it's similar to what I'm describing was omitted from the penalty phase mitigation presentation, but it would have also gone to rebut some of or explain some of this aggravation, this crime spree as you described it. And we do have a claim on appeal that alleges ineffective assistance of counsel based on failure to present mental state evidence that goes both to the capital crime, which occurred during that 11- or 12-month period, as well as these uncharged aggravators. And I'll also say that counsel could not have omitted this information strategically because, again, we have in the trial transcript trial counsel's own words during the IAC litigation against Andrew's prior attorney, whose name was James Spring, where current counsel or his actual counsel argues James Spring was defective for not having hired mental health experts, for not having interviewed him in the jail, for not having interviewed his family and friends who could have spoken to his mental state in the days and weeks and months and the period leading up to the capital crime and the aggravators. So he was on notice. He knew this was important. And he had that information. So, I mean, having brought that up, let me let me ask you this. The government responds and the district court responded, at least in part, that that was not the defense theory. The defense theory was Brown wasn't the person who actually shot the victim. And there's some evidence to support that. Wouldn't it have been inconsistent to try to present this evidence of he was a shooter, but he wasn't mentally in the right place versus he was not? I don't think so, Your Honor. I think it's it's consistent to present a mentally ill teenager who's rapidly decompensating from mental illness, from, yes, substance use, from trauma, from genetic predisposers, and also is not guilty of several crimes or a crime. So I don't think those two are inconsistent paths for counsel to take. And again, like I said, counsel didn't intend to just choose one or the other. They say in the trial itself that both would have been important. Do you want to address the incompetency issue? And let me ask you this before you do that. Between all of the IAC issues and incompetency, should you view one as being more compelling than the other? What's your strongest claim? You mean of all the claims that are briefed on appeal, Your Honor? Right. If I put the IAC, all the ineffectiveness, into one category and incompetency is a separate issue, is there a claim that you would identify as being the strongest? Your Honor, I think that the deficiencies at penalty phase, the failure to investigate and present mitigation, is more fulsome in that it contains such a high volume of errors and failures to act and gratuitous concessions, and the prejudice resulting from it is, again, correspondingly voluminous and also illustrated by the record very clearly. So I would say that is probably the more clear-cut path to finding a claim under Strickland. But once you demonstrate errors, then, of course, as you argued, you've got to get past the prejudice, and there we'll have to weigh that against the aggravating factors and then add deference on top of that, right? Yes, Your Honor. And as I mentioned before, I think the way we get past prejudice is we look at the real-time words that the trial judge used about how he felt, how he viewed the presentation at penalty, and he sums it up in a sentence that I quoted from the record when I mentioned it, and he says how that made him feel. He says, I thought there was compelling evidence of trauma. It happened when he was 5, and then there was nothing. There was this critical disconnect, and then this crime happened 12 years later. And then we have language from the jury saying, I was scared of him. I thought he was a gang member. I thought we were followed by members of his gang, unfounded. We have the district court judge saying it's fine for the jury to look at the words sociopath and usedictionary.com or whatever common sense understanding they have of the term. So we have all of this evidence of prejudice, and as Your Honors know, prejudice is assessed cumulatively. Even if there is not a single error that rises to the level of strickling prejudice, I'm listing so many errors. I think I started off saying I have four examples. The briefing has dozens more. So I think there are several examples of deficient performance. And again, like I said, the aggravation and the mitigation, and that's all the jury had to do. There just had to be a reasonable probability that one juror, at least one juror, would have weighed the aggravators differently with the mitigators. And I'm saying that if you could move things from the aggravation side of the scale to the mitigation side of the scale, that would have balanced things in favor of life and not death. And having unbalanced the scales for their own client, defense counsel didn't do anything to rebalance the scales. Your Honor, if- On your competency to stand trial claim, you know, there's a difference between having mental health issues, sometimes serious mental health issues, and not being able to meaningfully assist counsel. And I didn't-I'm struggling to see the connection between his mental health issues, which he definitely has, to the ability to understand the trial or to consult with counsel and, you know, what would have alerted the trial judge that there was a competency problem, especially when defense counsel who worked closely with him didn't raise that. I understand, Your Honor, that competency to stand trial is its own standard. We also allege intellectual disability, which is an ineligibility for the death sentence. I'd say in terms of competence, all the evidence that I just mentioned that was omitted or presented wrongly to the jury in penalty phase mitigation also speaks to his incompetence to stand trial. So, for example, developmental delays, mental illness, including psychiatric hospitalizations, which continued while he was in Riverside County Jail waiting trial. Self-medication, like, again, drinking heavily at age nine. These are not normal things that people do, and they don't- There's a big leap to talk about what happened at age nine to his competence to stand trial years later. So I think you've got to bridge the gap a little better than that. I agree with you, Your Honor. Am I correct that none of the experts who examined him talked about competency? That's true, Your Honor, and none of the experts were hired to talk about competency, which is- Did his attorney talk about competency? His attorney did not talk about competency, and I think that's- And one of the key measures is the ability to communicate with counsel. Counsel apparently didn't think that he was dealing with somebody who couldn't respond to questions, offer whatever comments you expect to get from client, so- Your Honor, I understand, and I'm making an argument that this trial counsel didn't do a lot of things they ought to have done. Another argument that is in our briefing is that trial counsel actually was operating under a conflict of interest. They had a reason, perhaps, not to raise competency of Andrew Brown. Andrew was stabbed in Riverside County Jail while awaiting trial by an individual who was also at Riverside County Jail and another inmate who was represented by the same counsel who was representing Andrew. So, I mean, this happened in real time, Your Honor. I think that it also speaks to competency and to trial counsel's awareness and- The life in jail. I mean, yes, Your Honor. I think it does speak to life in jail as well, but I think that its impact on Andrew, just like the alcohol and the mental illness and the psychiatric holds and the trauma, was to render him incompetent at that time. And I understand it's a leap from what happened at age 5 to age 9 to age 17 to 19 when this capital crime took place, but it's not that much time. And it compounds. It builds. Competence at trial is what is he doing at age, what is it, 22? I forget what year the case actually went to trial, but if nobody, if the judge presiding over the courtroom, if the lawyer he's working with, the experts, including those who've interviewed him, nobody else is talking about his ability to communicate. You're right, Your Honor. Who we have to look to. You're right, Your Honor. I will say that the timing does matter. It's important. Competency is, but it is not a static pronouncement. And you've got a whole array of issues with regard to being subject to the death penalty, but at age whatever 20 it was, okay. All right. You wanted to save some time? I do. I would like to save some time, Your Honor, and raise the Batson claim if I may, but I will take a seat for now. Thank you. Good afternoon, and may it please the Court. Vincent LaPietra on behalf of Respondent. The District Court properly denied relief in this case because the California Supreme Court reasonably rejected these claims as meritless. Counsel's defense strategy at the penalty phase was that Mr. Brown was flawed but redeemable. He noted that the aggravating offenses all occurred within a year of each other and that that year began shortly after Mr. Brown was hospitalized for a drug-induced mental health crisis. He explained that Mr. Brown suffered horrendous child abuse that resulted in untreated mental injury and substance abuse. He further presented evidence that people cared for Mr. Brown and that he had redeeming qualities in their view. Under the label of failure to investigate, Mr. Brown now seeks to second-guess counsel's tactical decisions. This claim fails, I think as is evident from the argument today, because Brown has not identified any particular failure to investigate or a specific piece of evidence that counsel could have unreasonably decided against presenting. This afternoon, Mr. Brown argues that counsel was deficient for failing to present evidence that cut against his mitigation strategy. He says membership of the gang from Dr. Kaiser Boyd, drug use without explaining the further background, and the rape of Catherine Brown, Mr. Brown's mother. Working in Serratum, there is evidence to establish that Mr. Brown was a gang member, as counsel noted, because the trial court allowed it during the guilt phase. Although counsel has presented some declarations establishing that perhaps he was not, what matters is that counsel definitely had a conversation with his client, knew what the evidence of that was regarding, and may have decided against focusing on that issue when Dr. Kaiser Boyd stated that it was her understanding that Mr. Brown was a gang member, especially when she clarified that she wasn't an expert on the matter and was merely intuiting that fact. The drug use without explaining the background, counsel certainly was aware of all of this information. In fact, the subheading in the opening brief states that counsel was aware of all of this information and, as the court noted, made a tactical decision regarding how to present this evidence. Certainly, during closing argument and through Dr. Kaiser Boyd, counsel established that Mr. Brown was a long addicted substance abuser, alcohol and drugs. But as this court noted in Mayfield v. Woodford, people don't, jurors don't look kindly on explanations of this kind of violent behavior being the result of drug use. So he definitely presented the information but wanted to contain that in order to allow the jury to view Mr. Brown as redeemable. Well, counsel, let me pick up where I started with your friend on the other side. The evidence that came in through Dr. Stewart about this crime, well, he didn't bring evidence about the crime spree, but his mental state and decompensation over the last year before the crime or these events around it, you know, he had another involuntary psychiatric hold. He had shot himself in the foot. There's testimony that he was out of his mind and other things. Why wouldn't that have been potentially powerful evidence to address or contextualize all the things that had happened, the evidence of uncharged crimes and aggravation, the other carjackings, you know, shooting and killing another person? Why isn't — tell me why you don't think that's deficient for not having introduced, if not investigated, that kind of evidence. Well, simply put, because it could have cut both ways, and counsel could now be arguing today that such evidence cut against the mitigation strategy, presenting additional evidence of firearms use, even though it was self-injury, would further a narrative of criminality with firearms. But also, all of this evidence, the crime specifically and the uncharged acts, were all very goal-oriented. Were all very specific with their intent. And I think it would be hard sell to say that he was decompensating and didn't know what he was doing when the record is beyond dispute that he was looking for rims and he shot somebody to take them and then he tried to sell them. But in the face of such compelling, aggravating circumstances, is it a reasonable choice not to throw what you have in an attempt to sort of, as Judge Sanchez says, contextualize it? Well, counsel was attempting— You've got to come up with an excuse, right, in the face of such serious conduct. And I think counsel specifically made that argument during closing. He said, this year, one-year aberrant behavior of all of these aggravating offenses began with Mr. Brown checking himself in for a drug-induced psychosis. And that is the argument to be made without dwelling too much upon it and parading a set of facts that perhaps could break it too far. So you're saying there was a balance in terms of how far to push, and so that's a reasonable tactical choice? Yes, Your Honor. I think it is certainly a tactical choice. And the question is, could all fair-minded jurists agree that it was unreasonable to strike that balance? And I think the California Supreme Court correctly answered that question in the negative. Now, on the investigation side, obviously counsel had some knowledge of drug use and that involuntary hospitalization with Dr. Chu. What does the record tell us one way or the other about the extent to which other things were investigated as they ended up being in the state habeas petition evidence? The record is deficient in terms of the scope of the investigation. As I noted in the brief, there is no declaration from counsel as to what exactly he looked at. And while that's not the only way to establish the scope of the investigation, none of the other factors are there. For example, there was a painter investigator, a defense investigator. There's no declaration from him. As the district court noted, many of the witnesses who have given declarations were, in fact, interviewed by that investigator. I think there are a handful, maybe five declarations that say we didn't speak to counsel, we didn't speak to defense counsel prior to trial. However, at least two of those witnesses, Jeanette Bender and Annette, Annette and Jenny, they both gave statements to the defense investigator painter prior to trial. So the record doesn't show any deficiencies in the investigation. It's all purely speculative. And as I mentioned, maybe five of the subheadings in this argument all begin with counsel knew. And so really this is just a claim that counsel should have made a different argument, presented the evidence differently during the penalty phase closing. But that's just a tactical decision. And the Supreme Court has held that defense counsel has constitutionally protected independence and that his decisions, strategic decisions like this, are nearly unassailable. Let me ask you this about I think somewhere in the briefing there was a discussion about Dr. Kaser Boyd recommending further neurological testing. And she wasn't qualified to opine about organic brain damage or other things herself, but I think she had recommended further testing. And then there's this Dr. Nunno report, or testing at least, that it doesn't seem to me to have been presented to the court itself. Was there something that counsel should have done with further testing, or did that happen with Dr. Nunno? Can you speak to those issues? Yes, Your Honor. The record citation that Mr. Brown gives in his opening brief is to an exchange on the record with Dr. Kaser Boyd saying she doesn't know, she couldn't conclusively rule out organic brain damage and that additional testing would have to be done to determine whether he had organic brain damage. Counsel certainly could have assumed, you know, through his hypotheticals of the way to proceed, that additional testing would have established organic brain damage, but decided against pursuing that evidence for multiple reasons, one of which is, as I mentioned, the risk of presenting Mr. Brown as irredeemable. But also, as we know from habeas proceedings, when Dr. Watson evaluated Mr. Brown for organic brain damage, he determined that Mr. Brown had an IQ of 90. So going into trial, the record was that Mr. Brown had an IQ of 77, which I think people can delay jurors, can comprehend it's a number that contextualizes things, whereas organic brain damage could risk establishing somebody as irredeemably violent, naturally violent, but also having an IQ of 90 and perhaps an intelligent, violent person by nature. I mean, we have cases in which we have found under AEDPA, I believe, that if counsel is aware that there's a possibility of organic brain damage and doesn't take steps to further investigate, that's not a reasonable investigation. I mean, I take your point. I think maybe what you're saying is with Dr. Watson that there may not be prejudice in the end because what he later found was a higher IQ score and mild organic brain damage. But certainly what seemed to at least suggest to me that if there was a possibility of this avenue of mitigation, evidence or something, that you ought to pursue it and look further into it now. Well, first of all, we don't know that he didn't. My point with the record citation and the opening brief to Dr. Kaiser-Boyd is that she has no declaration saying, I told counsel to do these acts and he didn't. So counsel may have, in fact, had Mr. Brown evaluated for organic brain damage and decided not to pursue that as an avenue of defense either at guilt or mitigation and didn't turn that over and we wouldn't know that. And, again, that speaks to the lack of declaration from either defense counsel, the various co-counsels, or the defense investigators. What was Dr. Nuno's findings? Dr. Nuno, I believe he administered the tests that Dr. Kaiser-Boyd reviewed and I believe that was the 77 IQ with below average intelligence. Right, but we don't have the scope of his details of his findings in the record. I don't believe the raw data is in the record, Your Honor, no. I mean, is it reasonable to infer that if it was not submitted to the court, that it was not so favorable to Mr. Brown? Is that something that we could take note of in some kind of way or does it not play one way or the other? Well, under the presumption of competence in Burt v. Titlow, the Supreme Court said that that presumption cannot be overcome absent evidence. So it certainly can be viewed as the court said or it could just be viewed as failing to meet your burden of establishing deficient performance. Right. So as I understand it, Dr. Kaiser-Brown said that she did review some tests but it wasn't clear exactly what she reviewed or the scope of that. Is there an indication in the record that maybe Dr. Nunez had made more extensive findings that she didn't have access to or we just don't know one way or the other? No, she said that she reviewed Dr. Nunez's testing. I don't know the scope of what Dr. Nunez did and what he gave to her or to defense counsel. No, Your Honor. In sum, on this claim, this claim is just a second guessing in hindsight of tactical decisions. There's nothing that counsel didn't know. He made a considered and deliberate strategic choice to challenge the aggravating offenses, present Mr. Brown as having a one-year aberration but being able to be redeemable, being treated. He had childhood trauma with mental health issues that had never been addressed and he had substance abuse issues that could be addressed. And counsel's argument, Mr. Brown's argument presupposes that there was some sort of pitch that he could have made that would have definitely been, that would have worked. But I don't think that that is necessarily true. And especially at the time, this trial occurred in 1991, 1991, 1992. Counsel was definitely in the best position to determine how arguments would be received by the jury, by the public. And, you know, today. Do we know why we don't know in the sense that was counsel available later when this came? No, there's no explanation for why. We just don't know. There's just nothing there. No, Your Honor. What about the prosecutor's argument about calling him a sociopath? Yes, Your Honor. It seems pretty thin grueled. I think the district court said, well, it was something you can reasonably infer from the evidence, but that seems a little bit of a stretch to me, potentially, unless it's being thought of in a colloquial way. Because no one had actually testified that he was properly diagnosed with that condition or actually having antisocial personality disorder. Was there error or some problem with the introduction of that argument at the trial? So the argument in the state court was that counsel was ineffective for failing to object to that prosecutor's statement. State law allows it because jurors understood it to be a colloquial term. And more specifically, I believe the court was referring to, the district court found that there was some evidentiary support for it, and I believe it was Dr. Kaiser-Boyd was asked about ADHD being, excuse me, ADHD. I wrote it down, but I lost it. Predisposing, ADHD predisposing people to certain behavioral issues, and she gave a list of them saying it's not just sociopathy. So directly from that statement, which was made during cross-examination, that it could be predisposed, ADHD could predispose one to sociopathy, in context of all of the evidence, the charged offense, the uncharged offense, everything, it was certainly within the realm of proper argument for the prosecutor to make. And even so, defense counsel could have decided against making an objection and highlighting that issue in the term sociopath to the jury. Unless the court has any other questions, I know that there was some discussion of incompetence to stand trial, and there's just simply no evidence of that. Nothing from defense counsel, nothing in the record that they point to, nothing from any of the experts who examined Mr. Brown. In fact, that Mr. Brown was able to cooperate with Dr. Nunez and others in the evaluation shows that he was furthering his defense. I know that counsel wanted to talk about the Batson issue, but wasn't able to do so. Well, timing means that she won't actually talk about it until after you're done, so as a preview of coming attractions, what would you anticipate saying in response to the anticipated argument about Batson? The state court recently rejected it as meritless. There were three black jurors, and this black juror wrote on the state court on the voir dire forms that he would only impose a death penalty if proven beyond a reasonable doubt. During voir dire, he said that he would only impose it for cold-blooded killers and sort of pushed back on the notion that the standard was different and was resistant to the notion that this was charged as a felony murder. And as I noted, we don't know. Counsel at the time, the prosecutor at the time, did not know if Mr. Brown would testify or what the defense would be. And so he gave a hypothetical about an accidental killing during a robbery to which this juror was resistant, demonstrated some hesitancy. So all of these factors gave rise to a legitimate, non-racial belief that the juror was not appropriate for this jury. He, the prosecutor, moved to exclude him for cause. The court denied that because the juror said he could faithfully oppose the law, which... We get that a lot. The prosecutor doesn't require... It's morbid, but death qualification of a jury produces some strange questions and answers. So against the background of the prosecutor having accepted the panel with a different black juror on it and the host of reasons cited in our brief, there's just no prima facie case or, excuse me, the California Supreme Court recently determined that Mr. Brown had not presented a Jackson violation. And resolved it, I believe, at step one, that there was no prima facie basis. In the trial court, yes, Your Honor. Right. Were there other prospective jurors that were asked or gave a similar answer about being leery of imposing the death penalty for something that might be deemed accidental or not intentional? There was at least one other juror who received the hypothetical of an accidental killing and gave a similar answer of hesitancy and I believe was also excused, but was not black. Any questions? It doesn't appear that we do. Thank you, counsel. Thank you, Respondent Smith. Thank you. Go ahead, counsel. Your Honor, may I start with the Batson claim or should I respond to the IAC claim that was previously discussed? You wanted to talk a little bit about Batson, so I want to make sure that you get a chance to do that before your time runs out.    In 1991, the state trial court applied California law, which is Wheeler's strong likelihood standard, to find that the prima facie showing was not made at step one of a Batson-Wheeler challenge as to prospective juror Sergeant Richard A. But Wheeler's strong likelihood standard is, as this court knows, contrary to Batson's mere inference standard, which has been clearly established federal law since 1986. The district court, in reviewing the last reason state court decision on this claim, as it must under Yielst v. Nunemaker, said, and I quote, petitioner's counsel, the state court found that petitioner's counsel had failed to make a prima facie showing sufficient to require the state to come forward with a nondiscriminatory purpose in seeking the peremptory excusal of juror Armfield. Batson constituted clearly established federal law at the time of petitioner's trial. And this is at 1 ER 211, where the district court then continued to erroneously equate the strong likelihood standard with mere inference in finding in 2007, 2017, I'm sorry, that Wheeler and Batson are essentially the same standards, without acknowledging that in 2005, the Supreme Court had held otherwise. Therefore, ad pedeference doesn't apply to this claim under 2254 D1. And this claim ought to be reviewed de novo. I thought that the California Supreme Court, don't we look at the data at which the California Supreme Court summarily denied the petition as the last reason decision? Not, which presumably would incorporate the US Supreme Court's kind of intervening clarification. Your Honor, that's not what the district court did here. And there was no dispute amongst the parties that the district court got it wrong. That said, I think the district court didn't get it wrong because it is in line with the Supreme Court's holding and yields, which is that where there's been one reason state judgment rejecting a federal claim, which this was because it was raised under Batson and Wheeler, later unexplained orders like the CSC summary denial on the merits upholding that judgment or rejecting the same claim rest upon the same ground. So we look through from the 2008 CSC denial to that 1991 reason decision and should find that it was contrary to an unreasonable application of clearly established federal law. But the look-through doctrine applies, I think, direct appeal. You look through. But this was an original habeas petition filed with the California Supreme Court. And so in that sense, even though it was a summary denial, we infer within it how it would have approached a lot of these issues. Isn't that so? The look-through doctrine, in your view, would go past the summary denial all the way back to the trial court itself? It goes to the last reason state court decision. The last reason state court decision on this constitutional claim was in 1991. And there was no issue. It was not raised on direct appeal. It was not raised on direct appeal, Your Honor, and for no strategic reason. And there is information in the record. There's extensive briefing for why it ought to be excused for direct appeal counsel's failure to raise it. That issue was not addressed despite the extensive briefing ordered by the district court, by the district court. And so I would ask respectfully for a remand to the district court to address that issue of this Batson, this otherwise meritorious step one denial of Batson to be addressed after a finding that the failure to raise it on appeal was excused either by cause and prejudice or miscarriage of justice, which we argue in our briefing. What do you think was the reasonable inference raised that this was a race-based exercise of the peremptory challenge? Your Honor, I think that Brown's counsel makes argument that there was a statistical disparity here. That comparative juror analysis also reveals disparate, not only disparate questioning, but disparate treatment of hardships between black and non-black jurors, disparate challenges for cause, and then disparate peremptory strikes. Obviously, there are at least two white jurors who also said on the record during voir dire that they needed to be convinced beyond a reasonable doubt to vote for death in the penalty phase. It's no different from what Sergeant Armfield, Sergeant Richard A., I apologize, said during his voir dire. Sergeant Armfield was not confused to the extent that he said something like, this is a loaded question in response to something the DA said to him. Cases like Miller L. and Flowers v. Mississippi make clear that disparate questioning that rises sometimes to the level of trickery as it did in this trial during voir dire can be an effort to mask racial discrimination, just like peremptory strikes can be. So that actually, his confusion, his manufactured bias, which the trial court rejected in the first instance as not bias at all by saying the fact that this is a loaded question actually is not anything to malign the DA. He told counsel this, and yet the district court cites this as one of the reasons for finding the peremptory strike was not motivated by race. Again, I'm giving you all these examples, Your Honor, but at step one, this court in cases like Finn have made clear that if you're looking through the record to find excuses to rebut the non-onerous inference at step one, then we've already got it wrong. We're already applying the Wheeler strong likelihood challenge. I see I'm out of time, but... I think my colleagues have any additional questions. We used up your rebuttal time because we wanted to ask about Batson. This is a serious case. Are there other issues that you want us to hear from you about? I don't invite you another 10 minutes, but I want to understand what you think our focus should be on. Your Honor, thank you for that. I am grateful for the privilege of responding. I want to make three quick points. I think the key issues here I see are the penalty phase, the mitigation presentation by trial counsel, and this Batson challenge. I want to make three quick points about the ineffectiveness at penalty phase in responding to opposing counsel. One is that when he said jurors don't look kindly on explanations of drug use, I think that's contrary to what the Supreme Court held in Williams v. Taylor, what this court held in Correll v. Ryan, which is the opposite. It says jurors need explanation when there's evidence of things like drug use and mental illness that cut both ways. These things are double-edged swords, and that explanation is key. It's not just a presentation. You just can't dump those words on a jury and ask them to draw their own common-sense conclusions or look it up in dictionary.com. They need an explanation. The second thing I want to say really quickly is that you don't need a declaration of trial counsel to establish prejudice or establish deficient performance in this case. I cited several parts of the record, the trial record itself, where trial counsel makes clear what his intent and what his strategy is. He uses words like, this is my tactical decision not to talk about gangs, and his expert talks about gangs. And then the last thing I want to say is that evidence of organic brain damage, it was available to trial counsel as early as Dr. Nono's testing. There was evidence that the pretrial testing showed 98% likelihood of organic brain dysfunction based on the Stroop test, which is particularly sensitive to frontal lobe dysfunction. And that's at 5 ER 695, 699 to 700. And Dr. Stewart and Watson reinforced and emphasized that information in 4 ER 592 to 93, 5 ER 684. I respectfully ask this court to reverse and remand to the district court. Thank you very much, counsel, to both sides for your very helpful arguments this afternoon. The matter is submitted and we'll issue a decision in due course. Court is adjourned.
judges: CLIFTON, NGUYEN, SANCHEZ